IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
FAYETTEVILLE DIVISION

JAMES CLAYTON SOLOMON                                               PLAINTIFF
REG. #03633-063

v.                                  No. 5:10CV05163 LH

HUNTER PETRAY, Captain,
Benton County Detention Center, *et al.*                           DEFENDANTS

### OPINION AND ORDER

This is a prisoner civil rights case which, unfortunately, took nearly seven years to get to trial. The day for trial finally came on May 22, 2017. All parties appeared and announced ready for a trial to the Court. After nearly three days of testimony, the case is ready for findings of fact and conclusions of law.

### RELEVANT PROCEDURAL HISTORY

Having been convicted of a federal offense and served a term of imprisonment, in 2007 James Clayton Solomon was on supervised release in the jurisdiction of the Western District of Arkansas when he was charged with committing new crimes while under supervision. On January 7, 2008, United States District Judge Robert T. Dawson found that Solomon had violated the conditions of supervised release and sentenced him to five years in prison. *United States v. Solomon*, No. 2:07CR20009-RTD (Jan. 7, 2008) (Document #29). Judge Dawson allowed Solomon to self-report and gave him until April 2, 2008, to surrender at the Bureau of Prisons to begin serving his sentence. *Id.* On February 6, 2008, Solomon wrote a letter designed to suggest that he was committing suicide. He sent one copy of the letter to a local newspaper and another copy to Judge Dawson. On Judge Dawson's copy he wrote, "judge dawson, may you die a slow and painful death by a disease. You're not a god!"

Solomon did not commit suicide. He absconded. He was later apprehended in California and returned to the Western District of Arkansas where he was placed in the custody of the United States Marshals Service and housed in the Benton County Detention Center, which contracted with the United States Marshals Service to house prisoners. Solomon was then indicted for failing to surrender for service of sentence in violation of 18 U.S.C. §§ 3146(a)(2) and (b)(1). *United States v. Solomon*, No. 2:08CR20029 JLH (Document #5). Solomon entered a guilty plea on May 23, 2008, before United States District Judge Jimm Larry Hendren. On October 10, 2008, Judge Hendren sentenced Solomon to a term of imprisonment of twenty-four months to run consecutive to the sentence in Case No. 2:07CR20009 and consecutive to sentences imposed in two different state court cases.

Solomon commenced this action *pro se* by filing a handwritten complaint on August 31, 2010. He initially named as defendants the United States Marshals Service and twenty-four officers of the Benton County Detention Center. In an addendum to the complaint, he subsequently identified two Deputy United States Marshals, Susan Jones and Cory Thomas, as defendants. The complaint and addendum alleged that Solomon had been beaten by deputies at the Benton County Detention Center on two occasions, once in late April of 2008 and once in late August of 2008. He referred to the incident in April of 2008 as a "blanket party." He also alleged that he was tasered in the August incident.

The two Deputy United States Marshals were named as defendants because, according to Solomon, they had conspired with the deputies at the Benton County Detention Center for him to be beaten as a result of writing a letter to Judge Hendren. Solomon also alleged that Thomas had used excessive force against him on a separate occasion.

2

Eventually, Solomon's court-appointed counsel[1] filed a seven-count amended and supplemented complaint, which Solomon verified. Document #146. That complaint reiterated the essential facts alleged in Solomon's original complaint and addendum but did so with more clarity. The amended and supplemented complaint named as defendants Deputy United States Marshals Susan Jones and Cory Thomas, as well as the following officers of the Benton County Sheriff's Department: Sheriff Keith Ferguson, Sheriff Kelley Cradduck, Major Gene Drake, Captain Hunter Petray, Captain Robert Holly, Lieutenant Carter, Sergeant Robbins, Sergeant Torres, Sergeant Larry Vaughn, Sergeant Charles Tomlin, Deputy Fry, Deputy Carlton, Deputy Wright, Deputy Johnston, Deputy Roland, Deputy Rankin, Deputy Elkington, Deputy Lockhart, Deputy Strickland, Deputy Lowther, Deputy Morrison, Deputy Wales, Deputy Juan Hernandez, Deputy Duncan, Deputy Engleman, Deputy Randy Bryson, Deputy Reyes, and Deputy Christopher Johnson.[2] Sheriff Cradduck was named in his official capacity. All of the other defendants were named in their individual capacities.

The first four counts were aimed at the Marshals. Count I alleged that Jones and Thomas retaliated against Solomon for writing an "unsavory letter to Judge Hendren." Count II alleged that the John Doe United States Marshals 1-5 retaliated against Solomon for writing the letter to Judge Hendren. Count III alleged that Jones and Thomas conspired with personnel of the Benton County

---

[1] On March 30, 2010, the Court appointed Morgan E. Welch to represent Solomon. Welch was elected to a judicial office in 2012 and withdrew. On December 11, 2012, the Court appointed Colin M. Johnson of Davis, Clark, Butt, Carithers & Taylor, PLC, to represent Solomon. Andrew D. Curtis, also of the Davis firm, subsequently entered his appearance as co-counsel for Solomon. Johnson and Curtis have represented Solomon in an exemplary fashion. The Court thanks them for accepting the appointment and representing Solomon zealously.

[2] The amended and supplemented complaint also named John Doe U.S. Marshals 1-5, but they were never identified, never served, and never became part of the case.

3

Detention Center to cause the beating that he endured during the "blanket party" on May 19 or the early hours of May 20, 2008. Count IV alleged that Thomas used excessive force by striking an unprovoked blow to Solomon on or about April 25, 2008.

The last three counts targeted the Benton County defendants. Count V alleged that Deputy Strickland, Sergeant Torres, Deputy Roland, Deputy Duncan, Deputy Bryson, and Sergeant Vaughn beat Solomon during the "blanket party" on May 19, 2008, or the early morning hours of May 20, 2008. Count VI alleged that Captain Petray, Captain Holly, Sergeant Robbins, Sergeant Torres, Sergeant Vaughn, Sergeant Tomlin, Deputy Fry, Deputy Carlton, Deputy Wright, Deputy Johnston, Deputy Roland, Deputy Rankin, Deputy Elkington, Deputy Lockhart, Deputy Strickland, Deputy Lowther, Deputy Morrison, Deputy Wales, Deputy Hernandez, Deputy Duncan, Deputy Engleman, Deputy Bryson, Deputy Reyes, and Deputy Johnson used excessive force against Solomon in August of 2008 when they entered Solomon's cell, beat him, and repeatedly tasered him. Count VII alleged that the officers of rank at the Benton County Detention Center failed to supervise and train the personnel of the Benton County Detention Center properly and fostered a custom whereby the use of excessive force was allowed and condoned.

Solomon subsequently filed a motion stating that, after the completion of discovery and a review of all of the evidence exchanged, he was requesting that the Court dismiss his claims against Sheriff Cradduck, Captain Holly, Sergeant Robbins, Deputy Reyes, Sergeant Torres, Sergeant Tomlin, Deputy Fry, Deputy Carlton, Deputy Wright, Deputy Johnston, Deputy Rankin, Deputy Elkington, Deputy Lowther, Deputy Morrison, Deputy Engleman, Deputy Bryson, and Deputy Johnson. Document #193. The Court granted that motion and dismissed those defendants. Document #194.

Also before trial, Solomon agreed that Count V, concerning the "blanket party," should be dismissed as to Deputy Strickland, Deputy Duncan, and Sergeant Vaughn. The Court therefore granted summary judgment as to those three defendants on Count V. Document #213 at 2. Thus, when trial commenced, the only remaining Benton County defendant on Count V was Deputy Roland. *Id.*

During the trial, near the completion of his case-in-chief, Solomon moved to dismiss his claims against the United States Marshals Service defendants. That motion was granted and those claims were dismissed with prejudice. Document #261. Solomon also dismissed his claims against Deputy Roland and Deputy Duncan[3] during the trial. Document #260. Deputy Roland had been the remaining named defendant on Count V, which alleged the beating during the "blanket party." With his dismissal, no defendants remained in that count.

After all of the dismissals described above, the remaining defendants were Sheriff Ferguson, Major Drake, Captain Petray, Lieutenant Carter, Sergeant Vaughn, Deputy Lockhart, Deputy Strickland, Deputy Wales, and Deputy Hernandez. The remaining counts were Count VI, which alleged excessive force in August of 2008, and Count VII, which alleged a custom or practice of allowing or condoning excessive force at the Benton County Detention Center, as well as a failure to train and supervise the Benton County Detention Center personnel.

## FINDINGS OF FACT

On August 22, 2008, Captain Hunter Petray, the jail administrator at the Benton County Detention Center, assembled a specialized emergency response team, which the defendants called

---

[3] Duncan had been named in Count V and Count VI. The claim against him in Count V, as noted above, was dismissed before trial, so this dismissal concerned Count VI.

5

the SERT team, for an operation in the section of the detention center where Solomon was housed. The SERT team is the jailhouse version of a riot squad or a SWAT team. The members of the team received special training and wore additional protective gear so they could enter a pod and quickly gain control of inmates without suffering injury. When inmates and their cells needed to be searched for contraband, a SERT team would be deployed.

Captain Petray's decision to assemble the SERT team on August 22, 2008, was precipitated by some inmates in the section of the detention center where Solomon was housed flooding their cells, apparently by stopping their toilets or breaking sprinkler heads. According to Petray, inmates would take advantage of shift changes to gain extra rolls of toilet paper or clothing. They would report to an officer on duty during one shift that they were out of toilet paper or "whites" and, when the shift change came, would reiterate the request for additional toilet paper or whites. Those additional items would be hidden and used at a later time to plug the drain in the toilet, which would cause flooding in the pod.

Because the officers had been unable to determine which inmates were causing the flooding, the SERT team was assembled to go into the cells in the affected area, search the inmates and their cells, seize any contraband found, and order inmates who had plugged their toilets to clean the area.

The team assembled on August 22 included Sergeant Larry Vaughn, Sergeant James Jessen, Corporal Christopher Lockhart, Deputy Charles Strickland, Deputy Chad Wales, Deputy Frischman, Deputy Michael Charles Dowdle, and Deputy Juan Hernandez. After being briefed, they assembled outside the area where the operation was to occur and divided into teams of two. Frischman and Hernandez went to cell 220 of Pod E-102, where Solomon was housed. Cell 220 was on the second floor of the pod with a landing or mezzanine, bounded by rails, outside the door to the cell.

Frischman and Hernandez ordered Solomon to get on his knees and put his hands on the wall. He complied with all of the orders that they gave. They searched the cell, found no contraband and exited without incident.

Sometime later, at or near the end of the SERT team operation, Strickland and Jessen went to Solomon's cell, accompanied by Petray, who was in civilian clothes, not in riot gear, and who stood back. According to the Benton County defendants, Strickland and Jessen went to Solomon's cell because he had been kicking and banging on the cell door, which is prohibited, and they intended to instruct him not to do that. They say that when they arrived at the cell Solomon precipitated an encounter by threatening Strickland. Solomon was ordered to put his hands on the wall. He initially complied but then spun around and moved to strike Strickland. A struggle ensued. With the assistance of Dowdle, Strickland and Jessen eventually subdued and handcuffed Solomon. On this account, the incident was precipitated entirely by Solomon, who threatened Strickland and then, after placing his hands on the wall, turned and went after Strickland.

Solomon's account is quite different. He testified that Strickland had been taunting him before August 22 and came to his cell that day, alone, and taunted him. Solomon responded to the taunting by inviting Strickland to remove his riot gear, enter the cell and lock the door so that they could settle it. Strickland left and came back with other officers. The officers immediately started yelling "stop resisting" and began tasering and beating Solomon for no reason. He responded, not by striking back, but by attempting to pull himself out to the landing area where he could be seen by other inmates, so the officers would stop beating and tasering him. He testified that he was tasered nonstop throughout the confrontation.

The parties agree that the altercation took between two and three minutes.

7

The conflict in the testimony requires some assessment of the credibility of the witnesses. Solomon's testimony, when it is not corroborated by other evidence, is difficult to credit. Solomon alleged in his complaint that he had written a letter to Judge Hendren, stating that he hoped that Judge Hendren would die a slow death. He also alleged that the Marshals retaliated against him for writing this letter to Judge Hendren. The letter was produced in discovery and was written to Judge Dawson, not to Judge Hendren. At trial, Solomon testified that Judge Hendren had sentenced him to five years in prison for violating his terms of supervised release, when in fact it was Judge Dawson. When it was pointed out to him that the court records show that Judge Dawson, not Judge Hendren, revoked his supervised release and sentenced him to five years in prison, he expressed surprise, because he continued to believe that it was Judge Hendren. Solomon also named several persons as defendants who participated in the "blanket party" who were not employed at the Benton County Detention Center in 2008 or who were not in the building on the date that the blanket party allegedly occurred. He stated that he recognized the voices of these persons, but that proved to be false. Similarly, Solomon alleged that he was transported from federal court in Fort Smith to the Benton County Detention Center by United States Marshals, but that also was proved to be false. And, as noted above, Solomon absconded after he was allowed to self-report. He wrote a false suicide note, assumed an alias and obtained a false identification, and lied to the marshals about his identity when he was arrested. Solomon is not a credible witness.

Strickland's account also is subject to doubts as to its credibility. According to his testimony, the entire incident was precipitated by Solomon, and he and the other deputies were entirely without fault. On Strickland's testimony, the physical confrontation was initiated by Solomon, and he and the other deputies acted solely in self-defense. Someone at the Benton County

8

Detention Center, however, must have thought that the deputies were less than blameless in this confrontation.

First, on Saturday, August 23, Solomon notified his public defender, James Pierce, that he needed to visit with him regarding the incident on the previous day. Pierce sent his investigator, Rafael Marquez, to the Benton County Detention Center to visit Solomon. When Marquez arrived, he was denied access to Solomon. Marquez has worked for the public defender for more than fifteen years. During that time, he has been denied access to a client of the public defender on only one occasion: when he sought access to Solomon on August 23, 2008. As a result of Marquez being denied access, Pierce had to travel to the Benton County Detention Center and insist that he and Marquez be allowed to visit with Solomon, threatening to notify Judge Hendren or the Marshals Service were he to be denied.[4]

Second, there was evidence that on August 22 Deputy Lockhart photographed the places on Solomon's body where he claimed to have been injured or where a taser had been used. Those photographs disappeared. No one knows who caused them to disappear or what happened to them. No evidence showed that they were deliberately destroyed or that any of the named defendants in this case had anything to do with their disappearance. But it is suspicious.

Third, on Strickland's account, Solomon not only threatened an officer but also assaulted an officer. These are very serious infractions of the detention center rules. Every witness from the Benton County Detention Center who was questioned on the point testified that a disciplinary report should have been written and that Solomon should have been disciplined. In fact, on August 23, in

---

[4] After Pierce arrived at the detention center, he and Marquez were given access to Solomon. Marquez photographed Solomon's injuries. Those injuries included skin abnormalities, which will be discussed later; minor abrasions; and a broken toe.

9

a separate incident, Strickland wrote a disciplinary report against Solomon for making threatening comments even though that day there was no physical confrontation and Solomon did not attempt to strike him. Yet, no one wrote a disciplinary report charging Solomon with any infraction on August 22, 2008.[5]

Nevertheless, the Court has concluded that the written report prepared by Jessen is probably accurate. That conclusion is based in part on the fact that Jessen's report of the portions of the SERT operation in which he participated includes an account of force used by Dowdle against an inmate named Wilmoth, which, by Jessen's admission at trial, showed that Dowdle's use of force was contrary to the policies of the Benton County Detention Center. The testimony established that Wilmoth subsequently brought suit alleging that excessive force had been used against him during the SERT operation on August 22, 2008, and that Benton County settled the case. That Jessen documented an inappropriate use of force during the same SERT operation in the same report in which he described the Solomon incident is reason to believe that his report is an honest and accurate account.

Jessen's report, which is Plaintiff's Exhibit 14, states in pertinent part:

> Once Deputy Strickland and I were at pod control, Deputy Johnston advised us that Inmate Solomon in E-102 cell 220 had been kicking his cell door. Deputy Strickland and I entered E-102 and proceeded to cell 220 where Inmate Solomon was being housed. Deputy Strickland radioed for pod control to open the cell door. Deputy Strickland ordered Inmate Solomon to get off of his bunk and to place his hands on the wall. Deputy Strickland informed Inmate Solomon that he needed to stop kicking or banging on his cell door.

---

[5] Each member of the SERT team wrote a report of the events in which he participated. These reports are not disciplinary reports—they report what happened but do not invoke the disciplinary process.

After talking to Inmate Solomon Deputy Strickland instructed Inmate Solomon to get back in his bunk. Deputy Strickland also instructed Inmate Solomon to sit on his bunk and not to get up until told otherwise by a deputy. Inmate Solomon asked Deputy Strickland what would happen if he did not stay in his bunk. Deputy Strickland replied, "Then me and Sergeant Jessen would have to come back to your cell." Inmate Solomon then stated to Deputy Strickland, "So you will come back by yourself?" Deputy Strickland asked Inmate Solomon what he meant by himself. Inmate Solomon said, "Why don't you take off your gear and shut the fucking door behind you. Just you and me, one on one." I entered Inmate Solomon's cell from Deputy Strickland's left and I ordered Inmate Solomon to get off of his bunk and place his hands on the wall. Inmate Solomon responded very slowly to my order and he was placed on the wall.

Once Inmate Solomon's hands touched the wall he pushed off of the wall attempting to turn around. I attempted to gain control of Inmate Solomon's left arm while delivering two knee strikes to Inmate Solomon's left common peronial. Deputy Strickland attempted to gain control of Inmate Solomon's right arm while delivering numerous knee strikes to Inmate Solomon's right common peronial. Inmate Solomon continued resisting us and Deputy Strickland and Inmate Solomon fell to the floor. I gave loud verbal commands for Inmate Solomon to stop resisting or he would be tased. Inmate Solomon did not comply with my order and he continued resisting. Deputy Dowdle arrived and attempted a mandibular angle pressure point on Inmate Solomon. Inmate Solomon continued to resist.

I removed my taser from its holster and I yelled, "Taser, Taser, Taser" to let Deputy Strickland know that I was deploying my taser. I drive stunned Inmate Solomon in his back left lower shoulder area. After the cycle was finished on the taser, Inmate Solomon continued to fight and resist. I again gave loud verbal commands to Inmate Solomon to stop resisting or he would be tased again. Inmate Solomon continued resisting and I attempted to drive stun him in his lower left back area, but it was unsuccessful due to Inmate Solomon kicking at me and the taser. I again attempted to drive stun Inmate Solomon, this time in his left outer thigh area. On this attempt my taser made contact with Inmate Solomon's left outer thigh area. At this point Deputy Frischman and Deputy Wales arrived to assist with Inmate Solomon. I placed my taser back into its holster. Inmate Solomon was placed in restraints and escorted to pod control to talk to Captain Petray and Sergeant Vaughn. After operations were complete in E-102, the S.E.R.T. team returned to pod control. Sergeant Vaughn, Corporal Lockhart and Myself entered E-102 and took pictures of where I had tased Inmate Branson and Inmate Solomon. The S.E.R.T. team returned to f-pod for debriefing by Captain Petray.

11

Strickland's report and Jessen's report are substantially consistent. Because the Court has concluded that Jessen's report is probably accurate, it follows that Strickland's report also is probably accurate. Strickland's report (Plaintiff's Exhibit 21) says, in pertinent part:

> After Sergeant Jessen and I exited E-104, Deputy Johnston advised me that Inmate Solomon, James (OCA# 88620) was kicking his cell door. Sergeant Jessen and I entered E-102 and walked up to cell 220, where Inmate Solomon was housed. I called pod control to open the cell door. I instructed Inmate Solomon to get off of his bunk and place his hands on the wall. I talked to Inmate Solomon and instructed him to stop kicking or banging on the cell door. I also stated to Inmate Solomon that he was supposed to remain in his bunk until told otherwise.
>
> I instructed Inmate Solomon to get in his bunk and stay there. Inmate Solomon complied. After Inmate Solomon was sitting on his bunk, Inmate Solomon asked what would happen if he did not stay in his bunk. I replied, "Then I and Sergeant Jessen will have to come back to your cell. Inmate Solomon stated to me, "So, you will come back by yourself?" I asked Inmate Solomon, "What do you mean by me?" Inmate Solomon stated, "Why don't you take off your gear and shut the fucking door behind you. Just you and me, one on one."
>
> At this point, Inmate Solomon stood up. Sergeant Jessen entered the cell from my left and instructed Inmate Solomon to place his hands on the wall. Inmate Solomon responded very slowly to Sergeant Jessen's orders. Sergeant Jessen and I attempted to place Inmate Solomon on the wall. Inmate Solomon then pushed off of the wall.
>
> I attempted to grab Inmate Solomon's right arm, and Sergeant Jessen attempted to grab his left arm. Inmate Solomon began resisting and fighting with us. I initiated several knee strikes to the right common peronial. Sergeant Jessen also initiated several knee strikes to the left common peronial. I attempted to place Inmate Solomon in a straight arm bar take down, with no success.
>
> Inmate Solomon locked his elbow with his arm tucked towards his body. Due to the knee strikes to Inmate Solomon's right common peronial, motor disfunction [sic] was apparent. Inmate Solomon could not stand on his right leg, and we fell to the floor. Once on the floor, Inmate Solomon continued to resist, I gave loud verbal commands to Inmate Solomon to stop resisting. Inmate Solomon did not comply. Sergeant Jessen informed Inmate Solomon that if he did not stop resisting he would be tased. Inmate Solomon did not comply.
>
> At this point, Deputy Dowdle came to assist us, and attempted a mandibular angle while giving knee strikes to the right common peronial. Sergeant Jessen

12

yelled, "Taser, Taser, Taser." And drive stunned Inmate Solomon's back left lower shoulder area. After Sergeant Jessen had released the taser and stopped tasing Inmate Solomon continued to resist and fight with us. Sergeant Jessen again, drive stunned Inmate Solomon in the left thigh area.

At this point, Deputy Wales had come to assist with Inmate Solomon. Sergeant Jessen placed his taser back into its holster, and assisted Deputy Wales in securing Inmate Solomon's feet and legs. At this point, I assisted Deputy Dowdle in placing leg shackles on Inmate Solomon, checking for double locks, and checking for proper fit and security.

Deputy Frischman and Deputy Wales escorted Inmate Solomon out to pod control to talk to Sergeant Vaughn and Captain Petray. After Sergeant Vaughn was finished speaking to Inmate Solomon, Deputy Dowdle and I escorted Inmate Solomon back to his cell. Deputy Dowdle removed the leg shackles, then the handcuffs. Deputy Dowdle and I exited the cell, closed the door behind us and regrouped with the S.E.R.T. team at pod control. The S.E.R.T. team regrouped in the briefing, where Captain Petray conducted debriefing.

According to Strickland's testimony on direct examination, when he arrived at Solomon's cell Solomon was at the door looking out. Both written reports show that Solomon was not at the door when Strickland arrived—he was sitting on his bunk. Strickland entered and instructed Solomon to get off of his bunk and place his hands on the wall. Strickland admitted during cross-examination that Solomon complied, though he did not note Solomon's compliance in his report. Strickland then instructed Solomon to stop kicking or banging on the cell door. At that point, the stated purpose of the entry into Solomon's cell—to instruct him not to kick or bang on his door—was accomplished. Strickland, therefore, could have exited at that point. Solomon was facing the wall with his hands on the wall, so Strickland could have exited safely. Instead, Strickland ordered Solomon to return to his bunk and stay there. Ordering Solomon to return to his bunk and stay there had no apparent connection to officer safety or jail administration. Nonetheless, Solomon complied and returned to his bunk. So far as the evidence shows, Strickland had no reason to order Solomon to stay on his bunk until he was given permission by a deputy to get up. Solomon

13

responded to this apparently unnecessary restriction by offering to fight Strickland. Jessen then entered the cell and instructed Solomon to place his hands on the wall. According to both reports, Solomon responded slowly but did so slowly. At that point, Strickland and Jessen attempted to place Solomon on the wall, which necessarily means that they put their hands on him. Strickland testified on direct examination that he did not touch Solomon until Solomon attempted to hit him. On cross-examination, however, Strickland admitted that he put his hands on Solomon to place him on the wall, which was before Solomon attempted a blow. When Strickland and Jessen put their hands on Solomon to place him on the wall, Solomon resisted, which started the struggle.

By this account, which the Court finds is probably true, Strickland and Jessen mishandled the situation, and Solomon responded with aggression. Both sides were at fault. Either could have avoided the struggle that ensued.

As noted, Strickland ordered Solomon to remain on his bunk until given permission by some deputy to get up, when there was no apparent reason for such an order. Until that point, Solomon had complied with all of the orders from both sets of deputies who had entered his cell that day. When he was ordered to stay on his bunk until given permission by a deputy to get up, however, Solomon responded by offering to fight Strickland, which of course was an inappropriate response, even if the order should never have been given. Jessen, who was superior in rank to Strickland, could have countermanded the order for Solomon to stay on the bunk. Instead, he ordered Solomon to place his hands on the wall a second time. Solomon was in the process of complying with that order, albeit more slowly than Strickland and Jessen wished, when they decided to put their hands on him to expedite his movement to the wall. While that use of force may have been unnecessary, it was not sadistic or malicious, nor was harming Solomon its purpose. Again, Solomon reacted to

14

the fact that Strickland and Jessen had put their hands on him by resisting—which he should not have done. The struggle began. The deputies involved—Strickland, Jessen, and later Dowdle—used force to gain control of Solomon. That force included grabbing and holding, striking the common peronial area of Solomon's legs with their knees, the use of pressure point techniques, and the use by Jessen of the taser. Jessen says that he tased Solomon twice—not multiple times as Solomon claims. In view of the fact that the entire struggle lasted no more than two or three minutes, Jessen's testimony is probably true.

As noted above, someone at the Benton County Detention Center apparently believed that the officers were not blameless in the confrontation with Solomon on August 22. Otherwise, there is no explanation as to why they denied Marquez access to Solomon on August 23. Furthermore, if the officers recognized that they were partially at fault for precipitating the struggle with Solomon, that could explain why they did not seek to discipline Solomon for threatening Strickland and attempting to strike him during this encounter. And, if the photographs taken by Lockhart of Solomon's injuries on August 22 were destroyed intentionally (which has not been proven), that fact could be explained by the fact that the officers mishandled the situation.

Strickland and Jessen's initial use of force was to move him to the wall, where he had been ordered to go, more quickly than he was moving on his own. The subsequent uses of force constituted an effort to regain control after Solomon began to resist. Although they mishandled the situation, the officers did not use force on Solomon sadistically or maliciously or for the purpose of causing harm or injury.

Photographs of Solomon's body were taken by Marquez on August 23. The photographs show a number of areas of his skin with an abnormal condition marked by discoloration and bumps.

15

Pierce testified that these marks appeared to be the result of the use of the taser. All of the officers testified to the contrary. The Court cannot say whether the skin abnormalities evident in the photographs were caused by the taser. Solomon did not prove by a preponderance of the evidence that these abnormalities in his skin were caused by the taser. In any event, so far as the evidence shows Jessen is the only person who used a taser on Solomon, and he was never named as a defendant in this case. Therefore, even if those skin abnormalities were caused by a taser, Solomon failed to prove that any named defendant caused them.

Solomon accused Petray of striking him on the neck with a hard instrument while the deputies were beating and tasering him. He also accused Petray of spitting in his hair at the pod control center. Solomon did not testify at trial that Petray had done these things. Marquez testified, however, that Solomon told him on August 23 that Petray had done those things. Petray denied doing them. The photographs taken by Marquez show that Solomon suffered a scrape on his neck where he alleged that Petray struck him. That scrape appears to be the kind of abrasion that would have occurred during the struggle with Strickland, Jessen, and Dowdle—not the kind of serious injury that would have been caused by Petray striking Solomon on his neck with a hard instrument. Solomon has failed to prove by a preponderance of the evidence that Petray used force against him.

Solomon failed to prove by a preponderance of the evidence that Vaughn, Wales, Lockhart, or Hernandez used excessive force against him.

## CONCLUSIONS OF LAW

On August 22, 2008, James Clayton Solomon was in the custody of the United States Marshals Service having been convicted in two cases and sentenced to serve a term of imprisonment in the Bureau of Prisons in one of them. In Case No. 2:07CR20009-1, he had been sentenced to serve a term of sixty months in the Bureau of Prisons. In Case No. 2:08CR20029-1, he had entered a guilty plea and been convicted of knowingly failing to surrender for service of sentence but had not yet been sentenced. At least with respect to Case No. 2:07CR20009-1, Solomon was no longer a pretrial detainee: he was serving a sentence of imprisonment. His constitutional claims of excessive force therefore arise under the Eighth Amendment. *Kingsley v. Hendrickson*, 135 S. Ct. 2466, 2475 (2015). To prevail on his claim that a defendant used excessive force against him, Solomon has the burden of proving by a preponderance of the evidence that the force was not applied in a good faith effort to maintain or restore discipline but, instead, was applied maliciously or sadistically to cause harm. *See Wilkins v. Gaddy*, 559 U.S. 34, 37, 130 S. Ct. 1175, 1178, 175 L. Ed. 2d 995 (2010). Solomon failed to prove by a preponderance of the evidence that any defendant used force against him maliciously or sadistically to cause harm. Although the officers handled the situation poorly, and the struggle during which Solomon suffered minor injuries was partially their fault, those facts do not give rise to a constitutional violation. Therefore, Solomon's individual capacity claims against Captain Petray, Sergeant Vaughn, Deputy Lockhart, Deputy Strickland, Deputy Wales, and Deputy Hernandez for using excessive force must be dismissed.

Solomon's claims against the officers in their official capacities are essentially claims against Benton County. *See Baker v. Chisom*, 501 F.3d 920, 925 (8th Cir. 2007). Individual liability must be found on an underlying substantive claim before the County or the supervisors can be liable.

*Moore v. City of Desloge, Mo.*, 647 F.3d 841, 849 (8th Cir. 2011). Because no individual has been found liable on an underlying substantive claim, the claims asserted by Solomon for supervisor liability against Sheriff Ferguson, Major Drake, Captain Petray, Lieutenant Carter, and Sergeant Vaughn in their individual capacities must be dismissed, and all of Solomon's official capacity claims also must be dismissed.

## CONCLUSION

For the reasons stated above, judgment will be entered in favor of the defendants. The claims of James Clayton Solomon will be dismissed with prejudice.

IT IS SO ORDERED this 30th day of May, 2017.

J. LEON HOLMES
UNITED STATES DISTRICT JUDGE